CAMPBELL *v.* PARKIN HOME BANK.

Opinion delivered April 18, 1927.

1. BILLS AND NOTES—MISTAKE IN SIGNING NOTE.—Testimony of the maker of a note, in a suit thereon by the payee bank, that he knew all the facts at the time he signed a note and that no facts were concealed from him, is conclusive against his contention that he signed under a mistake of facts or under false representations.

2. BILLS AND NOTES—FRAUD AND MISREPRESENTATION.—In a suit by the payee of a note where the defenses of mistake of fact and false representations inducing the signing of the note were completely disproved by defendant's testimony, the court properly directed a verdict for plaintiff.

Appeal from Cross Circuit Court; *G. E. Keck,* Judge; affirmed.

*T. E. Lines,* for appellant.

*Killough, Killough & Killough,* for appellee.

MEHAFFY, J.    The appellees filed suit in the circuit court of Cross County, alleging that the Parkin Home Bank is a banking corporation under the laws of the State of Arkansas, and that the defendants, including appellant, being indebted to plaintiffs on the 9th day of

January, 1924, executed and delivered to plaintiff their promissory notes for $909.44, due and payable on the 15th day of January, 1924.

Albert Campbell, the appellant, filed a separate answer, admitting that he executed the note, but denied that he owed the plaintiff anything. He alleged that, on the date of the execution of the note, he was confined to his bed with pneumonia and under the treatment of his physician, with high fever, and, under pain and misery as well as drugs, and, on account of his physical and mental condition on that day, he was not competent to transact business of any sort; that, while in such condition, the officers and employees or representatives of the bank came to his home and prevailed upon him to sign the note, representing to him that he had purchased a certain lot of cotton, and had not left with the plaintiff funds to cover the check that he had caused to be issued in payment of the cotton; that said representations were false in that defendant had left funds to cover said check; that such information was not at the disposal of the defendant, but was in the possession of the plaintiff; that plaintiff was defendant's banker, and in a position of trust, and defendant had a right to rely upon his representations; that he signed the note on account of said representations and under the conditions he had described. He alleged that the representations were false, and known to plaintiff to be false, and made to the defendant for the purpose of getting his signature covering an overdraft of his codefendant, and with which this defendant had no connection; that this defendant relied upon such representations, acted thereon, and is injured to the extent of any liability that may be attached to said note; that, if there was no fraud, said note was signed by mistake, and is void; that the note should be canceled, and that he had no complete and adequate remedy at law, and asked that the cause be transferred to equity.

The physician testified, in substance, that he attended the defendant, who finally took his bed, and that he

treated him during the month of January; that, on the 9th day of January, he was getting a little better from the pneumonia he had after the grippe. He learned from defendant's wife that he had signed the note that day. He was taking medicine that day. He had been sick about ten days, and was very much depressed, and had quite a bit of fever, but, at that particular time, he had a subnormal temperature; Dr. Smith said he was giving him a stimulant and cough medicine. He had fever all along for 6 or 8 days. When in a subnormal condition, he would not be in condition to do business any more than when his temperature was above normal. He was not delirious, just depressed and weak.

The appellant himself testified, in substance, that he went to the bank and told Mr. Phillips that Max was going to buy some cotton for him, and to honor his cotton checks and he would take care of them. "I covered Max's checks with Memphis checks; I did this nearly every day. I would check up the stubs we kept and the carbon copy, and would make a check to the Parkin Home Bank for the amount; those checks were made payable to the bank; the checks I gave Max for living expenses I made payable to Max; I did not know and was not concerned how the bank was keeping the cotton account, and I do not know how many accounts Max had at the bank. The cotton season closed in December, and I did not buy any cotton in January. Mr. Phillips and Mr. Hueman came into my room; I was sick in bed; I had been in bed a little over a week, with pneumonia; they said that Mr. Green was out there with a check that was given to Connor Brothers for this cotton, and there was no money to pay it. They wanted a note to cover the check. I had never had any of my checks go wrong or anything, and Mr. Hueman said Mr. Green was about to cut his throat, and Mr. Phillips asked me to sign the note, and I did. I really did not give the matter any thought. It was a question of my check going wrong, and I signed the note. I don't suppose they were there over five minutes; I did not see Mr. Green or the check. They said he was out

in front of the house. Mr. Phillips said he would pay the check if I would sign it with Mr. Hueman; neither said anything about the money having been there before to cover the check. Hueman had been buying cotton for me a month or six weeks; I had confidence in his ability to buy cotton; according to the agreement I had with Mr. Phillips, I was to take care of the cotton checks; they should have kept it so they could have told; the bank had authority from me to pay any checks that came in signed from Max Hueman and marked cotton; the bank did not know how many bales I had agreed for Max to buy; no one misrepresented to me the things when they came to the house with the note; they said Mr. Green was there with the check and there was no money to cover it, and I have since learned that that was true. They had let Max draw the money out. I have never had any of my checks to go wrong, and, when they proposed that I sign the note, I signed it. If I had been well, I would have stated that I would not sign the note because I had already gone in and covered the check. I should have known that I had, prior to that time, covered the check, but it just struck me that this check was out there and it was up to me to cover it. Whether I thought of it or not, I knew that I had covered this check. When I signed the note, I knew that I was signing it; I guess there were no facts concealed by the parties when the note was signed. I was familiar with those facts, but there was the question of my check coming back. I thought I had covered everything; I relied on Mr. Phillips for keeping this cotton account at the time I signed the note.''

Max Hueman testified with reference to the transaction, but we deem it unnecessary to set out his testimony, because appellant relies on two grounds only, and the testimony of this witness does not affect either proposition. In fact, the testimony of the appellant himself, we think, is conclusive on the questions argued. The first contention of appellant is that there was a mistake of facts. Of course, if there was a mistake of facts, and appellant signed the note with a misapprehension of fact,

after using proper diligence to ascertain and know what the facts were, this would be a defense to this action. But it appears from the record in this case that there were no facts that appellant did not know, and this court has recently said:

"The means of information as to the value of the land was as accessible to Pipkin as it was to Reed. The facts of this record bring the case well within the doctrine of the many cases of this court to the effect that, if the means of the information are equally accessible to both parties, they will be presumed to have information themselves, and, if they have not done so, they must abide by consequences of their own carelessness." *Lone Rock Bank* v. *Pipkin,* 169 Ark. 491, 276 S. W. 588.

But, as we have said, there were no facts in this case that the appellant did not know. The appellant himself testified:

"Q. But you knew those facts as well as any of those parties did, didn't you? A. Yes sir. Q. At the time you signed this note, state whether or not you knew that you had deposited money in the bank to cover this particular check? A. Yes, I was under the impression that I had, but I signed this note to keep this check from going bad. That was what I wanted to do."

Appellant again testified, as abstracted by himself: "Whether I thought of it or not, I knew that I had covered this check. I knew that I had covered all of them. When I signed the note I knew I was signing it. I guess there were no facts concealed by the parties when the note was signed. I was familiar with those facts, but there was the question of my check coming back."

Again, in testifying about the parties coming to him at the time he signed the note, he said: "I do not suppose they were there over five minutes. Mr. Phillips had the note, and went in the room and made it out; I did not see Mr. Green or the check; they said he was out in front of the house; Mr. Phillips said he would pay the check if I would sign the note with Hueman; neither said any-

thing about the money having been there before to cover the check.''

It therefore appears, from the appellant's own testimony, that he knew all about the facts, and that there was no mistake of fact that caused him to sign the note.

His next contention is that there was a false representation of facts, but appellant's own testimony completely answers this contention. He does not claim that there was any false representation of fact. He says in his testimony: ''No one misrepresented to me the things when they came to the house with the note. They said Mr. Green was there with the check, and there was no money to cover it, and I have since learned that that was a fact; they had let Max draw the money out.'' Then he said, as we have already quoted, that there were no facts concealed by the parties.

To affect the validity of any contract for false representation or misrepresentation, the misrepresentations must be material. The parties must be deceived, and must rely on the representations made. In this case it conclusively appears that there were no false representations made; that the appellant was not deceived; that no advantage was taken of him or sought to be taken of him, and he does not claim in his testimony that there was.

There was therefore no question of fact to be submitted to the jury, and this court has recently said: ''Hence there was no question to be submitted to the jury, and the court did not err in instructing a verdict for the plaintiff.'' *Mo. Pac. Rd. Co.* v. *Wellborn & Wells,* 170 Ark. 469, 280 S. W. 18.

And we conclude in this case that there were no questions of fact to be submitted to the jury, and that the court did not err in directing a verdict for the appellees, and the case is affirmed.